**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **FINDINGS OF FACT,** |
| | **CONCLUSIONS OF LAW,** |
| **vs.** | **AND ORDER** |
| **CARLOS A. GAMEZ** | |
| **a/k/a Carlos Alberto Gamez-Acuna** | |
| **a/k/a Boby Conejo Acosta,** | **Case No.  2:07CR156 DAK** |
| **Defendant.** | |

This matter is before the court on Defendant Carlos Gamez's Motion to Suppress.  An

evidentiary hearing on the motion was held on May 23, 2007.  After briefing by the parties,

closing arguments were heard on July 17, 2007.  At the various hearings, Defendant was

represented by Henri R. Sisneros, and the United States was represented by Mark K. Vincent and

Michele M. Kelley.  Before oral argument, the court carefully considered all pleadings,

memoranda, and other materials submitted by the parties.  Since taking the matter under

advisement, the court has further considered the law and facts relating to this motion.  Now being

fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

### FINDINGS OF FACT

Michael Bradford is a trooper with the Utah Highway Patrol, having functioned in that

capacity for approximately three years.  For the past two years, he has been assigned to the San

Juan County, Utah, state highways where he patrols the highways, investigates traffic accidents,

and performs criminal interdiction.

Trooper Bradford has been trained in narcotics interdiction and is familiar with drug indicators.  He has attended four phases of the Desert Snow training on illegal narcotics interdiction which includes training in drug pipelines, indicators of criminal activity, and hidden compartments.  He also participates in over 40 hours per year of additional training and is active with the Rocky Mountain Intelligence Network, a weekly update on recent drug seizures and indicators of illegal drug activity.  He has assisted in or actually made over 300 drug arrests in his career, including 15 seizures of large amounts of narcotics.  Trooper Bradford also has experience in identifying known drug pipeline corridors, indicators of illegal activity, and hidden compartments.

At approximately 7:21 in the evening on or about February 4, 2007, on State Road 191, just north of Monticello, Utah, Trooper Bradford stopped a north bound vehicle for speeding. Trooper Bradford's visual observation that the vehicle was traveling at an excessive speed was confirmed by radar, which showed the vehicle was traveling at 40 miles per hour in a 30 mile-per-hour zone, in violation of Utah law.  *See* UTAH CODE ANN. § 41-6a-601 (2005).  The vehicle was a 1998 white four-door Nissan Sentra with Nebraska temporary tags. The traffic stop lasted about sixteen and a half minutes.[1]

Trooper Bradford approached the Nissan on the driver's side.  He observed one occupant in the vehicle, that being the Defendant Carlos A. Gamez.  During the traffic stop, Trooper Bradford spoke to Gamez in English, and Gamez spoke to Trooper Bradford in English and

---

[1] The entire stop is preserved on a video and audio recording acquired by a camera in Trooper Bradford's patrol car and microphones in Trooper Bradford's patrol car and attached to his person.

Spanish.  Trooper Bradford does not speak Spanish and knows just a few Spanish words, but Trooper Bradford felt that Gamez understood him well enough to give answers to his questions, and that he understood the responses that Gamez gave to his questions.  During the traffic stop, whenever Gamez indicated that he did not understand, Trooper Bradford restated and clarified his questions until Gamez indicated that he did understand by giving an appropriate response to the question asked.

Trooper Bradford greeted Gamez, and Gamez greeted him in English, saying "Hi." Gamez then asked, "What's the problem?" and indicated in English that he was traveling 40 miles per hour.  When the trooper informed Gamez that he was speeding because the speed limit was 30 miles per hour, Gamez responded, "Okay, I'm sorry."  Gamez also responded without question to Trooper Bradford's requests for documentation on the vehicle, license, and insurance by handing over a Mexico driver's license with Gamez's photograph, a sales receipt for the vehicle, and proof of insurance, all indicating that Gamez was Boby Conejo Acosta.  Gamez also complied without question to Trooper Bradford's request that he exit the Nissan and accompany the trooper back to the patrol car.

When Trooper Bradford asked whether the Mexico driver's license was all Gamez had for a driver's license, Gamez responded "yes" and indicated the license was good for Aspen and Basalt, and that he had no other licenses, particularly out of Colorado or Arizona.[2]  Trooper Bradford asked Gamez whether he bought the Nissan in Nebraska on January 9, 2007, and how much he paid for it. Gamez responded, "yeah," he bought the Nissan in

---

[2] In fact, Gamez revealed later that he had an Arizona license.

Nebraska on January 9, 2007, for $2,500.00.  Gamez's responses were consistent with the information on the vehicle sales receipt.  Trooper Bradford also asked Gamez whether he paid cash for the Nissan, and for purposes of completing the warning citation, he also asked how many doors it had. Gamez replied that "no," he did not pay cash, and that the Nissan had four doors.

During the conversation within the trooper's vehicle, a second officer, Monticello Police Officer Shawn Bailey, arrived with his vehicle's rear deck lights on.  Officer Bailey pulled up, exited his vehicle, and knocked on Trooper Bradford's window.  Bradford told Officer Bailey that he needed to stay around.  This conversation between the two officers took place in the immediate presence of Gamez who was seated in the front passenger seat of Bradford's vehicle. Both officers were in uniform and armed.

During the stop, Trooper Bradford noted multiple indicators which, based on his training and experience, roused his suspicion that Gamez was involved in illegal activity.  Initially, Trooper Bradford noticed that Gamez was traveling north on State Road 191.  State Road 191 is a well-known drug pipeline corridor since it is a connecting road from Mexico and Arizona to points throughout the United States, and is thought by traffickers to have fewer numbers of law enforcement patrolling it.

Trooper Bradford also noticed that the Nissan had temporary tags from the state of Nebraska.  Trooper Bradford knew that some individuals involved in narcotics trafficking obtain and use vehicles for only three to six months so that the same vehicle is not repeatedly used to travel over the same route.

Trooper Bradford also noticed that Gamez shook uncontrollably when he handed his documents over.  Trooper Bradford makes as many as 25 to 30 traffic stops per shift and is familiar with the typical reactions of motorists stopped for traffic violations.  Trooper Bradford noted that Gamez's nervous reaction was excessive.  Trooper Bradford had noticed that while Gamez was in the patrol car, Gamez had shown signs that he was "overly extremely nervous." Gamez had shifted around, continually licked his lips, and had looked straight ahead, rarely looking at the trooper.

Additionally, Trooper Bradford noticed several other potential indicators such as the fact that Gamez had two cell phones in the Nissan. Trooper Bradford knew that individuals who traffic in illegal narcotics often have multiple cell phones, one for personal use and one strictly for narcotics trafficking.

Trooper Bradford also noticed a rumpled blanket on the back seat of the Nissan.  Trooper Bradford knew that individuals trafficking in illegal narcotics are often on time lines and seldom stay at motels, but rather take short naps in their vehicles.  It appeared to Trooper Bradford that Gamez had been sleeping in the Nissan.

Trooper Bradford also noticed a container of windshield-wiper fluid on the rear floor board of the Nissan.  Trooper Bradford knew that individuals trafficking in illegal narcotics are often over-prepared should an emergency arise. In this case, Trooper Bradford thought that the common person would store the windshield-wiper fluid in the trunk and that it was unusual that Gamez had it inside the vehicle.

Additionally, Gamez's story that he had left Aspen, Colorado, the previous night to visit his mother, Carmen Acosta, in Flagstaff, Arizona, and was already on his way back to Colorado,

seemed unreasonable to Trooper Bradford.

Trooper Bradford gave Gamez a printed warning citation, returned the documents, and told Gamez, in English, that he was free to go.  Gamez got out of the patrol car and proceeded toward the Nissan.  Trooper Bradford also exited the patrol car and moved toward the front end of the vehicle.  Officer Bailey, who had been seated in his vehicle parked behind Bradford's car, exited his vehicle exactly when Gamez exited and followed him until the point that Bradford intercepted Gamez at the front of the patrol car, at which point Officer Bailey took a position at the right front passenger door of Bradford's vehicle.  Trooper Bradford then asked Gamez if he could ask him some additional questions.  Gamez responded "yeah, okay."  Trooper Bradford asked Gamez whether he was doing anything illegal and if he had any illegal drugs in the Nissan, specifically cocaine, marijuana, or methamphetamine, to which Gamez responded in the negative.

Additionally, Trooper Bradford asked Gamez seven times for permission to search the Nissan, asking, "Can I search the car?"; "Is that okay with you?"; "Comprende?"; "Can I search your car? Is that okay?"; "Me go through and search it, okay?"; "Is that okay with you?"; "No problem?"  Each time, Gamez responded positively, saying, "Yeah"; "Okay"; "Okay"; "I guess so"; "That's okay"; and "No problem."

Trooper Bradford then opened the trunk and began searching the vehicle.  When Trooper Bradford found drugs inside of the spare tire in the Nissan's trunk, Gamez said in English that he did not know it was there and that it was in the Nissan when he purchased it.  After Gamez was arrested, he voluntarily admitted in English his true identity.  He also stated that he indeed had an Arizona driver's license and he recited his license number from memory.

## CONCLUSIONS OF LAW

There is no issue in this case regarding whether the initial stop was justified.  The question to be determined from the totality of the circumstances is whether the Defendant voluntarily gave consent for the search.  *See United States v. Mendenhall*, 446 U.S. 544, 577 (1980); *United States v. Valdez*, 889 F.2d 991, 994 (10th Cir. 1990).

Considering the totality of the circumstances, including the dialog between Trooper Bradford and Gamez during the sixteen and one-half minute traffic stop, Trooper Bradford's request to question Gamez further, Gamez's consent, and Gamez's responses to Trooper Bradford's additional questions demonstrated that, despite some difficulty communicating, Gamez understood Trooper Bradford's statements, requests, and questions, and responded in an appropriate, albeit not entirely truthful manner.  *See United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001) (affirming district court's finding that appellant demonstrated sufficient familiarity with the English language to understand and respond to the officer's request despite his trouble speaking and understanding English, based on his ability to, among other things, understand the officer's request for his name, identification, and information about ownership of the vehicle); *United States v. Corral*, 899 F.2d 991, 994-95 (10th Cir. 1990) (affirming district court's finding that despite appellant's claim that he could not consent to a search of his vehicle because he did not understand English, the record revealed he had a working knowledge of English and could and did consent to the search).

The Tenth Circuit has found consent to be voluntary when there is no evidence of coercion and the testimony establishes that consent was freely given, even when a defendant is in custody.  *See United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993).  Gamez maintains that

he did not understand the English language sufficiently to give knowing and intelligent consent

to Trooper Bradford to search the Nissan.  While a language barrier may be relevant in evaluating

a defendant's ability to act knowingly, intelligently, or voluntarily, the evidence here establishes

that Gamez did in fact understand Trooper Bradford's request to search the Nissan, and that

Gamez freely and voluntarily consented to the search.

Whether an individual freely and voluntarily gave consent to search is a question of

fact and is determined from the totality of the circumstances.  *See United States v. Pena,* 143

F.3d 1363, 1366 (10th Cir. 1998).  The government has the burden of proving valid consent. *See*

*Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Pena*, 143 F.3d  at 1366; *United States v.*

*Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993).  First, the government must provide "clear and

positive testimony that consent was unequivocal and specific and freely and intelligently given."

*United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995).  Second, the

government must show that the police did not coerce the individual into granting consent. *Id.*

The facts of this case are similar to–yet even more compelling than–the facts in both

the *Zubia-Melendez* and *Corral* cases.  In those cases, the Tenth Circuit affirmed the conclusions

of both lower courts that despite the appellants' claims that they did not understand the English

language sufficiently to give free and intelligent consent to search their vehicles, each appellant

did in fact have sufficient knowledge of English to give intelligent consent.  Specifically, in

*Zubia-Melendez*, the appellant had trouble speaking and understanding English, and the

videotape of the stop demonstrated his confusion at several points.  Yet because appellant

admitted that he understood the officer's request for his name, identification, and ownership of

the vehicle, the court affirmed the district court's conclusion that the appellant and the officer

could converse sufficiently to understand one another.  *See Zubia-Melendez*, 263 F.3d at 1163.

The Tenth Circuit found that the "[a]ppellant had sufficient familiarity with the English language

to understand and respond to [the officer's] request [to search the vehicle]."  *Id.*  The appellant

had at first denied consent, saying, "No, never," and when asked again, said "yeah, no matter."

*Id.*  The court found this to be freely and voluntarily given consent.  *Id.*

Likewise, in *Corral*, the Tenth Circuit had no issue with the district court's finding that

appellant had a sufficient working knowledge of English.  *See Corral*, 899 F.2d at 994.  This

finding was made even though appellant claimed he knew no English and understood nothing the

officer said to him during the investigatory stop (in direct contradiction of the officer's testimony

that he and the appellant conversed about appellant's documents, travel plans, and personal

history, and that the appellant gave one officer permission to search the vehicle).  The Tenth

Circuit found that appellant freely consented to a search of his vehicle based on the officer's

testimony that appellant said, "Yeah, you can look" and picked up a duffel bag and unzipped it

and then stood by without objecting as the officer searched the vehicle.  *Id.* at 992-94

In the case at bar, the government has met its burden of proving valid consent.  First, the

evidence revealed that Gamez understood and was responsive to Trooper Bradford's statements

and questions in English throughout the sixteen and one-half minute traffic stop.  The

conversation ranged from topics about the speeding violation and information about the Nissan,

to topics including Gamez's documents, family, personal information, personal characteristics,

and travel plans. When Gamez was confused or did not hear the trooper, he had no difficulty

expressing his confusion by asking for clarification, repeating a part of the question, or declaring

"I don't understand, a little bit for English." At those times, Trooper Bradford followed-up by

rephrasing or clarifying his statements or questions until he was satisfied that Gamez had understood him and that he had understood Gamez.

After the initial detention ended, and the encounter became consensual, Trooper Bradford asked Gamez seven times for permission to search the Nissan, asking, "Can I search the car?," "Is that okay with you?," "Comprende?," "Can I search your car? Is that okay?," "Me go through and search it, okay," "Is that okay with you?," "No problem?" and each time, Gamez responded positively. Given the totality of the circumstances surrounding the encounter between Trooper Bradford and Gamez, it is clear that Gamez understood Trooper Bradford's requests. Gamez did not appear confused, and indicated he understood what the trooper was requesting.  Gamez did not repeat Trooper Bradford's requests or hesitate, but rather answered affirmatively each time. Gamez understood Trooper Bradford's requests and gave unequivocal, specific, free, and intelligent consent for him to search the Nissan.  *See Zubia-Melendez*, 263 F.3d at 1163; *Corral*, 899 F2d 994-95.

Further, Gamez did not express any surprise when Trooper Bradford approached the Nissan and began his search, and he did not object to the search.  *See Corral*, 899 F.2d at 994 (finding appellant freely consented to the search of his vehicle through both his words and his conduct where he stood by and watched the search without objecting); *United States v. Lopez*, 777 F.2d 543, 548 (10th Cir. 1985) (finding specific and unequivocal consent where defendants told officers they had "nothing to hide" and then "stood by and watched as the officers searched the vehicle and at no time objected.").  *See also United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999) ("A defendant's silence and acquiescence may support a finding of voluntary consent.").  Accordingly, although the language barrier rendered the situation less than ideal,

10

when considered under the totality of the circumstances, the evidence is sufficient to find that the government has met its burden to show that Gamez's consent was unequivocal, specific and intelligently given.

Next the court must determine whether Gamez's consent was free from coercion. The circumstances which might indicate coercion include physical mistreatment, use of violence, promises or inducements, deception or trickery, and the physical or mental condition and capacity of the defendant within the totality of the circumstances. *See Pena,* 143 F.3d at 1367. Trooper Bradford was in uniform, was armed, and approached Gamez between the Nissan and the patrol car to request his permission to ask additional questions. Officer Bailey was also in uniform and armed. However, Gamez has presented no evidence that he was physically mistreated, that the officers pulled their weapons or touched him, that there was any violence, promise, inducement, deception, or trickery surrounding his consent to allow Trooper Bradford to search the Nissan. He also does not claim that his physical condition somehow rendered him incapable of giving voluntary consent. As for his mental condition, again, Gamez presented no evidence that Trooper Bradford used inappropriate means to obtain his consent. Trooper Bradford's requests to search were not commanding or aggressive in language or tone and the search were conducted along a public highway in the town of Monticello, in front of the patrol car's lights, with light traffic going by. Therefore, no evidence of coercion has been shown to have influenced Gamez's consent to the search of the Nissan.

Thus, the court finds that Gamez freely and voluntarily consented to the search of his car, even in consideration of the presumption against the waiver of constitutional rights**.**

**CONCLUSION**

Based on the above reasoning, IT IS HEREBY ORDERED that Defendant's Motion to

Suppress is DENIED.

DATED this 1st day of August, 2007.

BY THE COURT:

DALE A. KIMBALL
United States District Judge